DETYENS SHIPYARDS, INC., Libellant,

v.

MARINE INDUSTRIES, INC., and the TUG WAL-ROW, Respondents.

No. 1162.

United States District Court
E. D. South Carolina,
Charleston Division.

Oct. 14, 1964.

# 412

William H. Grimball, Jr., John C. Conway, Charleston, S. C., for libellant.

Benjamin A. Moore, Jr., Charleston, S. C., for respondents.

HEMPHILL, Chief Judge.

Libel for damages claimed from the loss of a drydock which sank in the Atlantic Ocean February 4, 1962 while in tow by respondent's tug "Wal-Row". Parties admit, and facts support, jurisdiction of this Court.[1] Stipulation on trial reserves question of amount of damages, if any, from this decision.

Libellant, operator of a ship repair yard near Charleston, South Carolina, purchased of Bethlehem Steel Company a wooden floating drydock then secured at owner's wharf on Staten Island, New York; the price was Twenty Thousand Dollars. Built in 1910 with an overall length of 198 feet 6 inches, 16 foot maximum draft, and lifting capacity of 890 long tons; she had had extensive repairs, maintenance and overhaul through the years. Her keel tracks were 130 feet 6 inches long and ran the length of her 8 foot deep pontoon, or "box", which supplied buoyance. Looking toward bow or stern it would have appearance of a "U" for on port and starboard sides were erected vertical "wing-walls" seventeen feet in height.

After purchase William J. Detyens, General Manager for Libellant, went aboard the drydock to inspect it, crawled through the various compartments, found it in good condition and contracted with Ardell Marine Corporation, of Brooklyn, to make the drydock ready for voyage to Wando River in Charleston County, South Carolina, at a cost of $3,354.65. Libellant took "towing pads" off of equipment at Charleston and shipped them to New York to be secured to log rails inside the wing walls, port and starboard. These pads were steel strips 10 feet long and 16 to 18 inches wide, and each had an eye, or eyebolt, to which towing hawsers could be fastened.

Libellant contacted respondent and verbally contracted to pay $6,000.00 for safe delivery at Charleston, or, if trip was incomplete $500.00 per day for each day's towing. Subsequently respondent's tug WAL-ROW was dispatched to New York to perform the tow. Captain Cumbee and crew of the WAL-ROW delivered the towing pads to the drydock and on Sunday morning, February 4, 1962, began the tow. On that afternoon a stop was made and according to Captain Cumbee, he felt the towing pads on each side were pulling loose from the log rails and the tow was re-rigged from a bridle extending to the towing pads to the structural members of an "apron".[2]

Following the re-rigging the tow continued in a normal manner until the early morning of February 6, 1962. There were no high seas or winds, the weather was calm, and nothing unusual occurred. Between 5 and 6 A.M. on February 6, however, the mate was on watch

---

1. Title 28 U.S.C. § 1333.

2. The apron was a deck on the bow of the drydock on which men stood to work. Before the voyage it was stripped of part of its flooring and only skeleton parts remained, among which were large timbers around which the towing hawser was tied in the re-rigging.

and he observed that the drydock was apparently sinking by the bow. The Captain was called, testified he could not risk putting a man aboard. In spite of efforts of the tug to tow the drydock to shore, she sank at approximately 8:45 A.M. in approximately forty-two feet of water, six miles southeast of the Cape May, New Jersey, Lighthouse. At 11:15 the drydock was cut loose, and the tug proceeded into Cape May harbor.

No one was aboard the drydock at the time of her sinking. The Captain and the crew of the tug were the only eyewitnesses of the sinking, and none of them testified as to the exact cause and manner of the entry of water into the drydock which resulted in her loss. Captain Cumbee's report of the loss to the United States Coast Guard was introduced in evidence, and in this report he described the casualty in the following language: "While being towed, for some unknown reason, sank."

 The law governing such situation is well settled. In a contract of towage, the owner of the tow is responsible for the seaworthiness of his vessel and the owner of the tug for its safe navigation. Curtis Bay Towing Company of Virginia, Inc. v. Southern Lighterage Corporation, 200 F.2d 33 (4th Cir. 1952).

"The owner of the tug is not an insurer against whom the mere loss of the tow raises a presumption of fault, Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; The Lapwing, 5 Cir., 150 F.2d 214; but he is obligated to perform his duties with such reasonable care and maritime skill as prudent navigators usually employ in similar undertakings, and with such consideration as special circumstances may require. The Admiral, 5 Cir., 84 F.2d 616; The Director, 4 Cir., 21 F.2d 47; The Morning Star, D.C.S.D.N.Y., 10 F.2d 538." Curtis Bay Towing Company of Virginia, Inc. v. Southern Lighterage Corporation, supra at 34–35.

"When an accident occurs to the tow the action is ex delicto and the burden is on the tow to show negligence on the part of the tug. However, circumstances may create a strong presumption of negligence. In that event the burden is on the tug to rebut the prima facie case or, at least, to show a reasonable excuse for the accident other than its own negligence. The Steamer Webb, 14 Wall. 406, 20 L.Ed. 774; The Clarence P. Howland, 2 Cir., 16 F.2d 25." Simkins v. R. L. Morrison & Sons, 107 F.2d 121, 122 (5th Cir. 1939).

 Conflicting evidence was introduced as to the seaworthiness of the drydock. Upon weighing this testimony fully the Court is of the opinion that she was seaworthy when the tow began. If, as Captain Cumbee testified, he questioned the seaworthiness, he should not have begun the tow. When trouble developed with the towing bitts, the drydock was still within the confines of New York Harbor, and in no danger. Under these circumstances it then became his duty to take reasonable precautions to preserve his tow. He could easily have returned to his point of departure, communicated with his superiors, and awaited further instructions. Instead of this, however, he chose to apply a jury-rig to the center timbers of the apron of the drydock and take his chances in the open sea, even though he was of the opinion that the drydock was unseaworthy.

The preponderance of the testimony establishes the seaworthiness of the drydock at the commencement of the voyage. Even if this were not so, her condition was not a concurring or contributing proximate cause of her fate, since the tug captain had ample opportunity to save the tow after he discovered the necessity of re-rigging her, and he failed to avail himself of this opportunity.

"While there is some evidence to support respondent's contention that the Covered Wagon was unseaworthy at the commencement of the voyage, this condition was not a concurring or contributing proximate cause of her fate. True as it may be that the scow's infirmities created and fostered her peril, there was still am-

ple opportunity for the master of the Clark to forestall her disaster. * * * " Curtis Bay Towing Co. of Virginia, Inc. v. Southern Lighterage Corp., supra.

■ Even though there was no direct evidence to establish the cause of the sinking, it may be conclusively presumed that the drydock sank because of the negligence of the tug captain in rigging the towing hawsers to the apron.[3] "From the circumstances shown, in the absence of proof to the contrary, it may be conclusively presumed the fire was caused by gasoline fumes igniting through contact with a lantern on the Sallie. This was the result of want of ordinary care and prudence on the part of * * * respondent * * *." Simkins v. R. L. Morrison & Sons, supra.

Libellant asserts, and the evidence preponderates, that the attempt to tow the drydock by a single line hawser attached to the structure of the apron, rather than as planned by a "bridle" was negligent. Respondent made no satisfactory showing that this was safe, customary, or contemplated; sought to establish the cause of the sinking as unseaworthiness, but failed to offer convincing proof. In addition, no plausible explanation was offered by Captain Cumbee for his failure to discontinue the tow when he observed the tow pads supposedly pulling loose.

■ The two-fold negligence of the tug captain in failing to discontinue the voyage when he had an opportunity to do so, and in attempting to tow the drydock in a hazardous and untried manner was the direct and proximate cause of the loss of the tow.

If the drydock was in fact in such an unseaworthy condition generally that it could not make the voyage to Charleston, as testified by Captain Cumbee, master of Respondent tug, then he should not have attempted to tow, or at least not attempted it without communicating his doubts to the drydock's owner.

If the placement of the towing pads was improper, rendering the drydock unseaworthy, at the time this appeared Captain Cumbee should have taken the drydock to shore, where adequate towing preparations could have been made. His failure to do so, and his further act of placing the towing halter on the timbers in the center of the drydock, was the proximate cause of the sinking of the drydock.

■ In a case of this nature, in which there is substantial testimony that the drydock was seaworthy, and in which there is no testimony that any unusual hazards of the sea were encountered, the rule laid down in The Anaconda, 164 F.2d 224, 228 (4th Cir. 1947) becomes applicable:

"Towage is not a bailment and the tug is not an insurer. The burden of proving negligence rests upon the tow. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699. But when an accident occurs under circumstances in which it would not ordinarily have occurred had the proper care been exercised, there is imposed upon the tug the duty of proving that the proper care was exercised. This is merely the application in admiralty of the well known rule of res ipsa loquitur."

Simkins v. R. L. Morrison & Sons, 107 F.2d 121, supra, a case involving the burning of a tow, sets forth the rule that the tow must show negligence on the part of the tug, but when circumstances are such that negligence can be presumed, then the burden is on the tug to rebut the prima facie case or at least show a reasonable excuse other than its own negligence.

Respondent has not met its burden of proof. Libellant is entitled to recover.

And it is so ordered.

---

3. There was expert testimony to the effect, and the Court so finds, that this type rigging caused all of the force of the tow to be concentrated on a small fore portion of the hull with a result that the watertight integrity of the hull was breached and the entry of the sea was effected.