**GEO. W. ROGERS CONSTRUCTION CORPORATION, Libellant,**

v.

**TUG OCEAN KING, her engines, boilers, etc., Red Star Towing & Transportation Company and Hughes Bros., Inc., Respondents-Claimant.**

**No. 61 AD. 523.**

United States District Court
S. D. New York.

Sept. 3, 1965.

Burlingham, Underwood, Barron, Wright & White, New York City, for libellant; Eugene Underwood, Robert B. Pohl, New York City, of counsel.

Foley & Martin, New York City, for Red Star Towing Transp. Co.; John H. Hanrahan, New York City, of counsel.

Thomas J. Irving, New York City, for Hughes Bros.; Christopher E. Heckman, New York City, of counsel.

TENNEY, District Judge.

The instant action, brought on the admiralty side of this Court, is to recover damages for the loss of libelant's pile driver No. 5 (hereinafter referred to as "No. 5" or "pile driver") which capsized and sank while in tow of respondent Red Star Towing & Transportation Company's (hereinafter referred to as "Red Star" or "respondent") tug OCEAN KING (hereinafter referred to as "OCEAN KING") on June 7-8, 1958.

The libel was tried to the Court without a jury on November 6, 9 and 10, 1964. Jurisdiction of the Court is not disputed.

In early April 1958, Hughes Brothers, Inc., a respondent herein (hereinafter referred to as "Hughes") contracted with libelant to tow No. 5 from New York City to the vicinity of Northville, Long Island, N. Y., and return. No 5 was towed to Northville on or about April 9, 1958. On or about June 6, 1958, Hughes, upon being informed by libelant that No. 5 was ready to return, engaged the tug OCEAN KING, owned by Red Star, to perform its contractual obligation to tow No. 5 back to New York. (See ¶ 6 of Libel, admitted in Hughes' answer ¶ 6, ¶ 3(d) of the Pre-Trial Order.)

In the early evening of June 7, 1958, the tug WESTCOAT, under the direction of Captain Louis Greenhalgh, towed the unmanned No. 5 from Mattituck, Long Island, into Long Island Sound. At a point about one mile northwest of Mattituck Creek, the WESTCOAT delivered the No. 5, rake end first, to the OCEAN KING, under the command of Captain Vincent Kendrick. Thereafter the OCEAN KING was made up to No. 5 on a hawser joined to a wire bridle which was secured to towing bits on the rake end of the pile.

The WESTCOAT ran alongside No. 5 for the first fifteen minutes, and by means of radio communication told the OCEAN KING that her method of towing and speed appeared to be proper. The WESTCOAT thereafter returned to Mattituck. The OCEAN KING, with No. 5 in tow, departed at approximately 8:00 P.M. and proceeded at a speed of 5 M.P.H. toward New York City. At that speed there was no solid water coming over the rake end of No. 5. The weather then, and for the entire period in question, was fine, the sea being calm with no swell and no chop, and the wind south-southwest variously estimated from 5 to 20 M.P.H.

Thereafter, at a time reported in the tug's log as 12:35 A.M., June 8, the OCEAN KING commenced to vibrate and No. 5 was discovered by the tug's personnel to be submerged and afloat upside down.

The tug was slowed down and during the next eighteen hours proceeded at a reduced rate toward New York to meet a salvage vessel which was to attempt to salvage the capsized pile driver. At approximately 6:00 P.M., June 8, the derrick COLOSSUS, in the tow of a Red Star tug, was observed approaching the OCEAN KING. The COLOSSUS gave an order through the tug's captain, to the OCEAN KING, to bring No. 5 alongside the derrick. In so doing the speed of the OCEAN KING was increased about ten revolutions and about a minute later No. 5 sank at a point 2.5 miles northwest of Eaton's Neck Light.

In mid-July 1958, a salvage diver found No. 5 in about eighty feet of water, resting down on her leads and rake end on a muddy, sticky clay bottom. A cable was affixed to her leads and as the salvage derrick took a strain on the cable, the pile driver pivoted on her rake end until she was righted and resting in an upright position on the bottom. The second day of operation the cable was secured to the leads and No. 5 was dragged toward shore until it lay in about 55 to 60 feet of water. Cables were secured

around the bow and stern, and on the third day she was hoisted until her house broke water and was then pulled into Oyster Bay and beached on mud flats in high tide.

The tide then dropped, exposing her deck and the 20 to 25 tons of mud (about five feet high) that had accumulated on the rake end. The mud was cleared off by hoses and shovels. After the deck was thus cleared, it was found that, of the five hatch covers placed on No. 5's deck, one at the rake end was missing and another was lying partly over its hatch opening. One forward hatch cover was lying adjacent to its opening and the other two forward covers were in place and battened with two-by-fours; in addition, the syphon outlets were not plugged.

The foregoing facts are not seriously disputed and I find them to have been sufficiently proven.

Before I proceed to a resolution of the conflicting facts, a brief summary of the generally well-settled principles of law, applicable to towage cases, is appropriate.

■ "In a contract of towage, the owner of the tow is responsible for the seaworthiness of his vessel and the owner of the tug for its safe navigation. [Citing cases.]" Curtis Bay Towing Co. of Va., Inc. v. Southern Lighterage Corp., 200 F.2d 33, 34 (4th Cir. 1952).

■■ "The owner of the tug is not an insurer against whom the mere loss raises a presumption of fault. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; The Lapwing, 5 Cir. 150 F.2d 214; but he is obligated to perform his duties with such reasonable care and maritime skill as prudent navigators usually employ in similar undertakings, and with such consideration as special circumstances may require. [Citing cases]." Curtis Bay Towing Co. of Va., Inc. v. Southern Lighterage Corp., supra, at 34–35. Moreover, "a tow is presumed to be unseaworthy *when she sinks under normal conditions, and in the absence of proof that she was improperly handled.* [Citing cases.]" The Radnor, 21 F.2d 982, 983 (D.Md.1927). (Emphasis added.)

■ On the other hand, while it is true that "[w]hen an accident occurs to the tow the action is ex delicto and the burden is on the tow to show negligence on the part of the tug. [it must be borne in mind that] * * * circumstances may create a strong presumption of negligence. In that event the burden is on the tug to rebut the prima facie case or, at least, to show a reasonable excuse for the accident other than its own negligence. [Citing cases.]" Simkins v. R. L. Morrison & Sons, 107 F.2d 121, 122 (5th Cir. 1939).

The application of these principles to the disputed facts herein is the task to which I now direct myself.

No. 5, built in 1904, was a rectangular, flat-bottomed wooden-hulled craft about 58 feet long by 24 feet wide by 6 feet deep, with a rake at her stern. At her bow or lead end she had 65-ft. high wooden leads holding the 4,000-pound driving hammer, and, at her stern or rake end, a wooden house which enclosed the machinery—consisting of a boiler, a two-drum hoisting engine, an air compressor, two coal bunkers and an air tank. Inside of the hull, beneath the machinery, there were located two boiler water tanks designed so that any water in them could not overflow into the hull. In addition, there were three steam-operated syphons built into the hull, their lower ends about one to two inches above the bilge, and their outlets cut off flush with the deck. Two were located at the lead end and one on the port side of the rake end. Access to the hull was by means of five hatch openings, two at the rake end and three between the house and the leads. Each was equipped with a circular metal hatch cover.

Caulking had been done on No. 5 in the fall of 1955 on a mud flat at Rogers' Staten Island Yard. The areas checked and caulked included both sides and the lead end. In order to properly caulk

these areas, the sheathing covering them was removed, exposing the hull planking underneath. The hull planking on both sides and the lead end, revealed when the sheathing was thus removed, was inspected by the Yard Superintendent, Sigmund Stach, and he was satisfied as to its condition. The caulking on the deck area was renewed as well. However, due to the fact that No. 5 was not in dry dock but only lay on a mud flat, it was not possible, for obvious reasons, to efficiently caulk the bottom and rake ends at that time.

Thereafter, in January of 1956, it was determined that No. 5 needed further work done, and she was drydocked at the Brewer Staten Island Yard, operated by the Brewer Dry Dock Company.

In addition to the renewal of caulking on the bottom and rake end (which process included reefing out the old caulking, replacing it with new caulking and painting the seams with black seam paint), the entire bottom planking was respiked, as was the planking on the rake end after the sheathing had been removed. Holes left by eroded spike heads were searched out and plugged with wooden plugs, as well. Several timbers that had outlived their usefulness were replaced and another approaching that stage was reinforced. Lead flashing, used for protection to cover the seams, was installed at the aft end. All the work was done to the satisfaction of the Yard Superintendent, Stach.

Stach was last aboard No. 5 in November 1957, eight months prior to her capsizing, and at that time her condition was, in his opinion, very good, as was her watertight integrity.

From mid-April 1958 to June 4, 1958, No. 5 was engaged in tearing down and constructing a fire-damaged pier in the Sound off Northville, Long Island. She normally worked five days a week, weather permitting, and up to ten hours a day. On each working day she was towed a round-trip distance of ten miles from her berth in Mattituck Creek to and from the project without incident. Captain Greenhalgh, who towed her this distance each day, described her hull as being sound.

In addition, No. 5's engineer, Selmer Jorgensen, testified that he very seldom found more than ½ of an inch of water in her hull, which usually leaked in through open syphons or entered some place when the bow was pulled under water while pulling piles, or when swells from passing steamers surged over her deck. There was also the water created by the natural tendency of all wooden-hulled ships to sweat. However, rainwater was never found below deck. He described the condition of her sides, ends and bottom (viewed of course, from the inside of the hull) as good, as was the condition of her deck. While at Northville, he seldom used the syphon pumps to remove any water. On June 4, her last day at Northville, Jorgensen checked her hull and found it dry. On June 5, 1958, after cleaning up No. 5 he tightened up the handle plates on the boiler and pumped out any water that was in it, and then covered up the hatches with their covers and battened them down with two-by-fours. The house doors were also closed. In addition, he drove wooden plugs into the syphon deck outlets to plug them up, and the hammer at the lead end was secured about six feet above deck. Her condition, when he left her, was described as good.

While these facts may have been brought into question by reason of No. 5's deck condition after salvage, i. e., missing hatch cover, battens and plugs, etc. (see p. 659, supra), I find that all the hatches were secured and battened down by two-by-fours and that the syphons were plugged prior to towage, and that the fact that they were missing when surveyed was as a result of the capsizing, sinking and the salvage operation.

Aside from the fact that two of the two-by-fours were found battened down after salvage, and nail holes were found in the area of the other hatches, Captain Greenhalgh, respondent's witness, testifi-

ed that he saw the hatches battened down. If the two covers had become dislodged during the tow, then, being steel, they would have fallen free and sunk when the tow capsized, whereas they were found adrift. The missing cover and battens were, in all probability, dislodged during the salvage operations; and I so find.

When No. 5 was picked up on June 7 by Captain Greenhalgh, to be towed out of Mattituck Creek and delivered to the OCEAN KING, she was, in his opinion, fit for towage. As he stated: "If I didn't figure it was towable, I wouldn't have taken her out."

Admittedly, there was a plywood patch on the deck of No. 5 which had been placed there in April 1958 to cover up an opening about one inch wide and six inches long, where water had been coming in. Respondent's marine expert testified that the patch was not watertight. However, in the period from April to June 7, 1958, in spite of the fact that No. 5 had been towed ten miles a day, five days a week, and had been worked at the construction site each of those days, and presumably had encountered not only a "light spray" on her decks, but on occasions her decks had been awash, there was no testimony from Captain Greenhalgh that the leaky condition had continued, or that there was any problem after the patch had been placed; in fact, if Greenhalgh had any doubts about the patch it is highly questionable whether he would have considered her fit for towage. Furthermore, when he picked her up she was riding level in the water with no indication that there was any water in her hull. Under respondent's theory the only water that reached the patch was some light spray, hardly enough to leak through the patch and thereby breach No. 5's watertight integrity. Even under libelant's theory of excessive speed and the decks awash with water, there is no indication of excessive leakage through the patch since some fifteen minutes prior to capsizing there was no yaw in No. 5, she was not cranky, and towing satisfactorily (see p. 662, infra), from which a reasonable inference can be drawn that her hull was not at that time full of water which would breach her integrity. Thus I find that the presence of the patch did not render No. 5 not reasonably fit for her intended use.

On the issue of No. 5's unseaworthiness, I briefly pass from the towage itself to the salvage operations. The procedure employed in raising No. 5 is fully set forth at pp. 658, 659, supra.

After being thus raised and brought to Jacobson's Shipyard in Oyster Bay, Long Island, No. 5 was surveyed.

Nicholas Ryder, libelant's surveyor, saw No. 5 for the first time on July 22, 1958, and again several days thereafter, the last day being July 29, 1958. He found no breach in the watertight integrity of her hull, and no breaks or holes in the bottom planking, nor in the side and end planks, which he inspected both from inside and outside of the hull. There was no evidence offered by Red Star's surveyor, Kenneth Terry, which would in any way reflect on the watertight integrity of No. 5's hull, the thrust of his testimony relating to her deck.

Any doubt as to the soundness of her hull is dispelled by respondent's testimony that, after capsizing, No. 5 remained afloat for more than eighteen hours while being towed by OCEAN KING. If her bottom side and end seams and timbers were not tight, the air trapped in her hull would have quickly escaped and she would have gone down much sooner. The fact that she stayed up so long is evidence that she was able to retain the air in her hull for that length of time and reflects quite favorably on the soundness of her hull.

In addition, after she had capsized, Captain Kendrick, who was captain of the OCEAN KING, saw No. 5's bottom exposed, and one to one and one-half feet of vertical siding as well. He testified that, from his observation, her bottom looked very good, that there were no openings in her hull and that the one to one and one-half feet of vertical siding

looked good also. In addition, the fact that No. 5 had, within the past two years, been overhauled and her bottom and sidings checked and faulty timbers removed, is something to be considered, as is her constant use by Greenhalgh without incident.

The survey further revealed that the caulking on the bottom side and end seams was started, as was the caulking on parts of her deck. In considering the cause of this condition and whether it existed during towage, it must be borne in mind that No. 5 had been recaulked within the preceding three years; that caulking should be renewed about every five years and usually lasts between six to eight years, and that No. 5 was submerged for almost four weeks after sinking.

There was testimony to the effect that the caulking started as a result of the salvage operation and in view of the stress put on No. 5 at that time; and I so find. For insofar as the hull and sides are concerned, if the caulking had been defective prior to towage it is questionable whether, after capsizing, she would have retained the air and floated for such an extended length of time. In addition, as will be noted infra at p. 662, the observations of Kendrick and Donald Maloney, second mate on the OCEAN KING, immediately prior to capsizing, and the testimony of Greenhalgh, negate any inference that the hull and side caulking was sufficiently defective to permit the entry of water and thereby cause the capsizing of No. 5. Furthermore, there was testimony advanced which I find persuasive to the effect that after capsizing the pressure of the air inside the hull increased, due in part to the weight of the machinery pulling No. 5 down, and with the pressure thus increasing there came a point that the air was forced out through the seams and caulking of her bottom and sides until the water finally entered through these now exposed areas and caused No. 5 to sink.

Insofar as her deck is concerned, there was testimony, both live and graphic, that a hole was found on the deck of No. 5 during the survey. The hole was about five inches long and two inches wide and was located about two feet from the rake end. However, there was no testimony that the hole existed prior to salvage and in fact the evidence presented would lead to a contrary conclusion. Thus Kendrick testified that when the tow was being made he had a clear view of that area of No. 5's deck where the hole was found, to wit, between the house and the rake end, but saw no hole.

Jorgensen likewise made no mention of any hole, and Greenhalgh, who was recalled as a witness because he remembered the presence of the plywood patch, made no mention of any hole in that area. Moreover, it is highly unlikely that he would have considered No. 5 fit for towage if there was a hole on her deck. I therefore find that there was no hole on the deck of No. 5 prior to her capsizing.

Similarly, the testimony about the open seams on deck found during the survey is not persuasive of the fact that they existed prior to capsizing. Aside from the testimony that the open seams may have resulted from the stresses during salvage and the period of submersion, and the fact that the caulking in those seams had been renewed in the fall of 1955, we have testimony about the condition of No. 5 immediately prior to capsizing as well as her condition when Greenhalgh picked her up and prior thereto, which leads to the conclusion that she was at that time fit for towage.

Prior to her capsizing, Kendrick had examined her between six and eight times and found her not to be yawing "a bit", nor was she listing, and she was towing satisfactorily and was not "cranky". Similarly, Maloney, who found her capsized, stated that when he checked her she was in good condition and on even keel. At 12:00 M., only 35 minutes prior to capsizing, she was inspected again and found to be on even

keel, level with the water, not yawing and staying right behind the tug. At 12:20 A.M. she looked the same as before. Both Maloney and Kendrick testified that during the entire trip the only water that fell on No. 5's deck was a "little bit of spray" but "no solid water". If we assume that to be true, and that the seams were in fact open, it is inconceivable that "a little bit of spray" could cause such an accumulation of water in the hull as to cause No. 5 to capsize; in fact, Ryder stated that even if the seams were open during towage there would be no entry of water. Moreover, if the water had in fact entered, it is difficult to understand how, just fifteen minutes prior to capsizing, there was absolutely no indication that such a great amount of water had thus accumulated. She was on even keel, not yawing, level in the water, not cranky and towing satisfactorily.

The same holds true for the alleged hole, the hatch covers that were alleged not watertight, and the plywood patch. If only light spray fell on the deck, there was an insufficient amount of water to accumulate and cause the capsizing in view of her condition fifteen minutes prior thereto. And even if her decks had been awash, as will be seen *infra*, there was similarly no indication, fifteen minutes prior to capsizing that any appreciable amount of water had seeped into her hull and accumulated there.

Thus, on the basis of the testimony presented, I find that the hull, sides and deck of No. 5 were reasonably fit for their intended use, i. e., that they were sufficiently sound and tight to shed such water as is necessarily incident to towage at proper speeds; in other words, that No. 5 was sufficiently fit "to encounter the ordinary perils of the voy-age." (The Arctic Bird, 109 F. 167, 169 (N.D. Calif.1901).)[1]

Accordingly, I now proceed to determine whether the No. 5 capsized "under normal conditions and in the absence of proof that she was improperly handled" so as to raise the presumption of unseaworthiness. (See The Radnor, supra.)

The testimony of Captain Greenhalgh, who knew more about No. 5's towing idiosyncrasies than any other witness, reveals that No. 5, with her high center of gravity, shallow draft, low freeboard and tendency to sail before the wind and act "like a Sailboat", was a "tricky tow"—and, accordingly, the speed at which she was towed was of paramount importance. That Kendrick was aware of this fact is revealed by his request of Greenhalgh to follow alongside the tow and counsel him as to whether the speed was appropriate.

After the WESTCOAT delivered No. 5 to the OCEAN KING at Mattituck Inlet, the OCEAN KING set out toward New York at a speed estimated by Kendrick and Greenhalgh at 5 M.P.H., and which was considered "safe". At approximately 8:00 P.M., Greenhalgh headed back toward Mattituck, and OCEAN KING, with No. 5 in tow, continued on alone. Greenhalgh testified that the length of the hawser was approximately 300 to 400 feet, and Kendrick estimated its length at about 480 feet.

Thereafter, and before dark, the flotilla passed off the Northville Dock Company about three miles from Mattituck Inlet. At that point, Captain Kendrick estimated that he was two miles off the shoal line and 1.1 miles off the buoys. Captain A. H. Fertig, an independent witness whose testimony is crucial to

---

1. Parenthetically, if it were found that due to the excessive speed of OCEAN KING, No. 5's decks were awash with water and because of this unnatural amount of water there was leakage through the deck into the hull, causing an accumulation of water and eventual capsizing, she would not by reason of that condition be unsea-worthy since the standard to be applied is reasonable fitness for intended use, and No 5 was a pile driver, not a submarine. However, as will be noted *infra*, I am of the opinion that the excessive speed and the taut hawser, rather than any accumulation of water, caused the No 5, a tricky tow, to flip over and capsize.

libelant's case, stated that the OCEAN KING was approximately one-quarter to one-half mile off the buoys, where Fertig was situated inspecting mooring buoys. In any event, I find that Captain Fertig was sufficiently close to the OCEAN KING so as to observe what he testified to. While there is also a conflict as to the time that the flotilla reached Northville, Kendrick stating that it was 9:15 P.M. and Fertig stating that it was approximately 8:35 P.M., I find that the flotilla passed Fertig when there was still sufficient daylight to make accurate observations and at approximately 8:35 P.M.

Fertig, as noted above, bore no relation to either side and was qualified by libelant as both an expert and fact witness, having observed the passing of the flotilla. His qualifications need not be set forth herein; suffice it to say that I find him to be an expert on the towing and piloting of vessels.

At the point of observation, Fertig saw the flotilla proceeding at an extremely fast and excessive speed with the result that No. 5 was down by the head with one to two feet of solid water coming over her rake end. The speed, in his opinion, was twice what it should have been. He observed the pile and tug proceeding at this speed for some twenty minutes or so.

While Kendrick and Maloney testified that the constant speed was about 5 M.P.H., I find their testimony unpersuasive. Aside from the fact that both are clearly interested witnesses in that their actions or failure to act may cause their employer to be found liable in the instant proceeding,[2] there are a number of facts which cast serious doubt on their testimony.

When passing the Northville dock, Kendrick testified, he was going 5 M.P.H. However, he stated the revolutions being turned at that time were "about 280, around 285", the revolutions at maximum speed being 300 R.P.M. He had increased the R.P.M.'s from 100–150 which she was turning prior thereto, according to his testimony, at 8:15 P.M. This increase to an almost maximum amount of R.P.M.'s then being turned would be reflected either in an increase in speed (which Fertig observed) or an increase in tautness of the hawser, the tug moving at the same speed but at more revolutions, showing that she was straining and pulling harder, or this high amount of revolutions reflecting both a tautness of the hawser and an increase in speed.

I find, based on Fertig's testimony which I accept as credible, that at this point of observation the tug had in fact increased her speed and was proceeding at an excessive speed. Moreover, the estimate of Maloney that the tug was proceeding at 5 M.P.H. and at a constant 200 R.P.M. was cast under a grave shadow of a doubt when it was revealed that an erasure had been made by him as to the amount of revolutions being turned in the accident report he had filed. There was also an unexplained erasure in the engine log book under the heading of R.P.M.

In addition, Fertig estimated the length of the hawser to be about 150 feet, which, in his opinion, was too short, because such a short hawser tended to put too much strain on the tow, pulling her rake end down; that the line was taut as stated by Fertig was conceded by Maloney and is reflected in the increased R.P.M.'s. Fertig stated that such tautness would not exist in a hawser of proper length, i. e., 280 to 350 feet.

On the basis of this testimony, I find that the speed of the tug was excessive and that one to two feet of solid water were coming over her deck. I further find that the hawser was extremely taut and that by reason of the tight hawser and speed, No. 5's rake end was being dragged down during the towage, a result of which would be to cause the vessel to flip over.

2. See The Rocona v. Guy F. Atkinson Co., 173 F.2d 661, 665 (9th Cir. 1949).

Accordingly, I find that the deck of No. 5 was reasonably fit for its intended use and that she did not capsize by reason of the "light spray" that respondents testified fell on her deck. The capsizing was caused by the excessive speed of the towage and the shortness and tautness of the hawser, all combining to push her rake end down until she suddenly took a dive and flipped over.

Moreover, if she did capsize by reason of accumulated water in her hull (even though at 12:20 P.M. there was no such indication), the accumulation resulted not from an unseaworthy deck, but rather from the improper method of towage which caused an unnecessary amount of water to fall on her deck.

The situation presented herein is similar to that presented in Monongahela River Consol. Coal & Coke Co., v. O'Neil, 144 F. 74 (5th Cir.1906), where a flat bottom boat with a derrick and other machinery on her main deck suddenly "made a complete somersault, turning bottom side up" when the head or bow of the dredge was run under water as a consequence of being towed too fast. The Court initially noted that the towing characteristics of such craft required special care:

"As the evidence shows, and in the very nature of the case, such a construction as this dredge boat has a tendency when pushed through water too rapidly to dive or put the head thereof under the water * * *. "Id. at 77.

In holding the tug solely at fault the Court said:

"The rate of speed * * * which under existing conditions will put the head of such a tow under water, is dangerous and excessive with that tow in those conditions." Id. at 78.

Moreover, putting aside for the moment the affirmative finding of excessive speed, what we are presented with— even accepting the testimony of respondents about "light spray" on No. 5's deck (see pp. 662, 663 supra)—is a seaworthy pile driver being towed in calm water, with no chop, in perfect weather, capsizing for no apparent reason.

"In a case of this nature, in which there is substantial testimony that the drydock was seaworthy, and in which there is no testimony that any unusual hazards of the sea were encountered, the rule laid down in The Anaconda, 164 F.2d 224, 228 (4th Cir.1947) becomes applicable:

'Towage is not a bailment and the tug is not an insurer. The burden of proving negligence rests upon the tow. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699. But when an accident occurs under circumstances in which it would not ordinarily have occurred had the proper care been exercised, there is imposed upon the tug the duty of proving that the proper care was exercised. This is merely the application in admiralty of the well known rule of res ipsa loquitur.'

Simkins v. R. L. Morrison & Sons [5 Cir.], 107 F.2d 121, supra, a case involving the burning of a tow, sets forth the rule that the tow must show negligence on the part of the tug, but when circumstances are such that negligence can be presumed, then the burden is on the tug to rebut the prima facie case or at least show a reasonable excuse other than its own negligence." Detyens Shipyards, Inc. v. Marine Indus. Inc., 234 F.Supp. 411, 414 (E.D.S.C.1964).

This Red Star has not done.

■ Accordingly, based on the aforesaid considerations, I find that libelant is entitled to recover for the loss of No. 5. The question of damages, as agreed to by the parties, was reserved for determination before a commissioner after conclusion of the trial on the merits.

■ One point remains for consideration, and that is the liability of the respondent Hughes Bros., Inc. As noted supra, it is admitted by the pleadings, and set forth in the Pre-Trial Order, that

Hughes orally contracted with libelant to tow No. 5 for a valuable consideration from New York to Northville, Long Island, and back. After the work was done at Long Island, Hughes was informed by libelant that the tow was ready to return, and Hughes, in turn, engaged the tug OCEAN KING, owned by respondent Red Star, to perform its contractual obligation to tow No. 5 back to New York.

Based on these admitted facts, I find that the contract to perform the task of towage from New York to Long Island and back was made between libelant and Hughes, and that Hughes, in turn, subcontracted with Red Star or designated Red Star as its agent to perform the contract. In any event, Hughes is liable for the negligent performance of the contract.

"The fact that [tug OCEAN KING] * * * [is] liable *in rem* and [Red Star Towing & Transportation Company] * * * [is] liable *in personam* for the negligence does not prevent [Hughes] * * * from * * * being liable [as well]." Todd Shipyards Corp. v. Moran Towing & Transp. Co., 247 F.2d 626, 628 (2d Cir.1957).

Accordingly, the tug OCEAN KING is found liable for the sinking of pile driver No. 5, and the respondent Red Star Towing & Transportation Company, by reason of the fault of the tug OCEAN KING, which it operated, is similarly liable *in personam*. Hughes Brothers, Inc., as the party with whom Rogers Company contracted, is secondarily liable. See Todd Shipyards Corp. v. Moran Towing & Transp Co., supra; Allied Chemical & Dye Corp. v. Tug Christine Moran, 190 F.Supp. 703, 708–709 (S.D. N.Y.1961) and cases cited therein, modified on other gds., 303 F.2d 197 (2d Cir.1962); 86 C.J.S. Towage § 81 (1954).

The above constitutes the Court's findings of fact and conclusions of law.

Submit decree in accordance therewith.