NATIONAL TRANSPORT CORP., as
Owner of the TANKER, NATION-
AL DEFENDER, Libelant,

v.

The TUG ABQAIQ, her engines, boilers,
etc. and Arabian American Oil Com-
pany, Inc., Respondents.

No. 63 AD 337.

United States District Court
S. D. New York.

July 17, 1968.

Poles, Tublin, Patestides & Stratakis, New York City, for libelant; Melvin J. Tublin, Theodore P. Daly, New York City, of counsel.

Boal, McQuade & Fitzpatrick, New York City, for respondents; Arthur M. Boal, Arthur M. Boal, Jr., New York City, of counsel.

COOPER, District Judge.

This libel is brought to recover damages allegedly sustained by libelant's tanker, the National Defender, as a result of respondent's negligence during docking operations at the Port of Ras Tanura, Saudi Arabia. Jurisdiction of the Court is not disputed.

During the early morning hours of September 3, 1961, the National Defender [1] was being docked at Ras Tanura, a port operated by respondent Arabian American Oil Company, Inc. (hereinafter Aramco).[2] Harbor Pilot Smith, employed by Aramco, boarded the tanker at 0030 hours on September 3, 1961. The docking operation was completed and the vessel was secured portside to the dock at 0320 hours. Two tugs, Abqaiq I and Abqaiq II, owned by Aramco and operated by its employees, assisted in the docking. The Abqaiq I was on the starboard bow of the National Defender while the Abqaiq II positioned itself on the starboard side at the stern (Pre-Trial Order, ¶3(a), May 25, 1965).

The National Defender loaded a full cargo of fuel oil at Ras Tanura and departed near midnight on September 4th for Sasebo, Japan. The tanker arrived there on September 20, 1961, and commenced discharging its cargo later that same day. On September 21st, Virgil Hall, a consulting marine engineer and naval architect, while on inspection in a launch circling the vessel, observed damage to the hull of the vessel on its starboard side forward of the break of the forecastle head.[3]

Libelant contends that the tug Abqaiq I, while assisting in docking operations at Ras Tanura, negligently struck the National Defender causing damage to its starboard side. The evidence adduced at trial before this Court, sitting without a jury, on the sole issue of liability indicates three significant factual areas of controversy.[4]

1. The National Defender, built in 1955, is in common parlance a "super-tanker." Its overall length is 810 feet; breadth 104 feet; depth 66 feet. The distance from the peak of her bow to the forward position of her wheelhouse is approximately 345 feet. The width or beam inside the wheelhouse is approximately 41 feet. The vessel's deadweight tonnage is 67,295 tons (Maycroft depo. p. 6; Exhibit 6).

2. Aramco operates the port and appurtenant facilities at Ras Tanura at which tankers are loaded. It owns, operates and furnishes tugs and tug assistance to bring vessels to the loading berths, and furnishes the pilots who assist in the docking of vessels calling at the port.

3. The damage was repaired in Sasebo in January of 1962.

4. This Court had reserved decision on respondent's offer of Exhibit B (marked during the taking of Pilot Smith's deposition) into evidence. The exhibit is a statement, dated November 18, 1961, Ras Tanura, to Captain A. G. Dakers, signed by S. B. Smith. It purports to contain information relating to the docking of the National Defender on September 3, 1961. Respondent apparently contends that this document is admissible as Smith's "recollection recorded" (Tr. 82). No proper foundation for admission having been laid, we sustain the objection to Exhibit B. In so doing, we note, however, that most of the information contained in this document is already in evidence through the sworn testimony of Smith and other witnesses. The document neither adds nor detracts significantly from the present record.

Libelant's motion, made at the start of trial, to amend its libel to add an allegation of negligence on the part of the pilot, to wit that "[t]he pilot failed properly to maneuver the steam tanker National Defender and keep apprised of the position of and direct the tug Abqaiq I in the condition of sea and weather obtaining at the time of the collision," has already been denied (Tr. 4-11).

### (a) *Position of Abqaiq I*

Respondent, relying in the main on the testimony of tugboat Captain Jaber Mohammed, contends that the position of the Abqaiq I was such that it could not possibly have caused damage to the vessel in the area alleged.

Mohammed testified that he made his tug's front lines fast forward of the bridge, "about eight feet from the bridge"[5] (Tr. 142).[6] When ordered to push by Aramco's Pilot Smith, he brought the tug forward until its lines were taut and then maneuvered the tug so that it was at a right angle to the vessel.

The distance between the bridge and the forecastle head is approximately 250 feet (Tr. 55). The lines on the tug were 150 feet in length (Tr. 147), and the distance from the water line to the main deck forward of the bridge was approximately 40 feet (Tr. 57). Relying on Mohammed's testimony that the lines were secured to the bitt forward of the bridge, respondent concludes that its "tug could not have gone forward at a greater distance than the midpoint between the bridge and the forecastle head,"[7] and therefore could not have caused damage to the hull forward of the break of the forecastle head.[8]

The validity of respondent's conclusion depends entirely on where the tug's lines were fastened to the National Defender. For the reasons set forth below, we are convinced that the Abqaiq I positioned itself at a point further forward than that testified to by Mohammed.

Master Maycroft, Third Mate Florence, and Pilot Smith all agree that the tug came alongside the vessel in the vicinity of the break of the forecastle head and tied up through the chock just aft of there.[9] Smith testified that this was the normal position for the tug to take,[10] and had it positioned itself anywhere else he would have been informed (Smith depo. pp. 5, 42). It was Smith who determined how many tugs were to be used in docking and where they should be applied with respect to the vessel (Smith depo. p. 39).

There appear to be three chocks between the bridge and the forecastle head. Florence testified that "there is one down just where the forecastle head comes down to the main deck level. There is one just aft of there. Then the next one aft of that would be some distance * * *." (Florence depo. p. 43). The latter appears to be the chock ("C") marked on Exhibits 6 and 11, and alleged by Mohammed and respondent to be the one through which the tug's lines were secured.

---

5. Hall marked off the bitt and chock forward of the bridge on Exhibits 6 and 11, and estimated their distance from the center of the bridge at 41 feet (Tr. 53–56).

6. "Tr." followed by a number refers to pages of the transcript of trial proceedings.
   "Ex." followed by a number or letter refers to an exhibit in evidence.

7. Brief for Respondent, p. 41.

8. In its reply brief, respondent states: "at the very maximum, the bow of the tug could not have been more than 120 feet forward of the chock which would place it at the No. 1 tank or 50 feet aft of the spot where the damage was located by Virgil Hall." Respondent's Reply Brief, p. 2.

9. Maycroft, Florence, and Smith testified by way of deposition (depo.) dated June 25, 1963, September 12, 1963 (Ex. 13), and December 3, 1963 (Ex. 15) respectively.

   While their descriptions of the area where the tug came alongside the vessel vary, they all appear to point to the vicinity of the break of the forecastle head. Maycroft and Florence place the tug somewhat further forward of the break of the forecastle head (Maycroft depo. p. 23; Florence depo. p. 14).

10. Smith's testimony appears to be in direct contradiction to Mohammed's statements that the pilot ordered him to "come alongside forward of the bridge" (Tr. 152–53), and that he did not go as far forward as the forecastle head—"I am always backward from this spot" (Tr. 149).

■ We credit the testimony of Maycroft, Florence, and Smith on this particular issue, and in so doing disregard all of Mohammed's testimony which is inconsistent. We find that the tug's lines were fastened through the chock near the break of the forecastle head, and that the tug therefore was in the area of the damaged portion of the hull.

(b) *Abqaiq I struck the National Defender*

Captain Maycroft [11] and Third Mate Florence both testified that the tug struck the National Defender. Maycroft says that the tug would push up under the bow,[12] surge and come away, and then strike again; "it was surging up and down, and it touched the ship with a jar. It struck the vessel hard enough so that you could feel it when it struck * * *" (Maycroft depo. p. 24). Florence recounts that the tug struck the vessel "quite hard," two or three times, from the action of the sea. He could hear the noise when the tug and the side of the vessel made contact; it struck so hard that it set the fogbell on the tug's open bridge ringing (Florence depo. pp. 15, 55–56). Neither Maycroft nor Florence was able to observe, from their respective positions on the bridge, the actual contact between the tug and the vessel (Maycroft depo. p. 52; Florence depo. pp. 44–45).

Chief Mate Baum, who was stationed on the forecastle head, called the bridge to report that the tug was "banging against the bow and he was afraid she was going to do damage" (Florence depo. pp. 15–16).[13] When the tug backed away from the vessel,[14] Baum, using a flashlight, checked the bow over the side and reported back to the bridge that he could see no apparent damage (Maycroft depo. p. 25; Florence depo. p. 16). No inspection was made of the starboard bow in the daylight of September 3rd (Maycroft depo. p. 57).

■ We are convinced that the Abqaiq I struck the National Defender during docking operations notwithstanding Mohammed's testimony to the contrary.

(c) *The striking caused the damage alleged*

The draft of the National Defender on its arrival at Ras Tanura was 19'–00" forward and 25'–00" aft. The vessel, while secured port side to the dock, loaded a full cargo of fuel oil and departed at 2340 hours on September 4, 1961 with its draft 44'–05" forward and 45'–05" aft. It arrived at Yokose Terminal, Sasebo, Japan, on September 20, 1961, bearing draft of 43'–03" forward and 44'–07" aft, and commenced discharging part of its cargo. At completion of discharge, the vessel's draft was 20'–06" forward and 26'–09" aft (Ex. 2).

On September 21st,[15] Virgil Hall, while in a launch circling the vessel to

11. Maycroft was a licensed master for ten years and had twenty six years of experience at sea at the time of the collision.

12. Maycroft explained the difference in the construction of the vessel's side: "if the tug had come alongside No. 1 [tanks], he would have been pushing against a flat surface. Where he came alongside, there is a slight flair [sic]. The bow becomes pointed and it curves up in a flair. The plates curve in and up in a flair there" (Maycroft depo. pp. 23–24).

13. Maycroft testified that he called the chief mate on the public address system and told him to "get the tug out of there" (Maycroft depo. p. 24).

14. It appears that the tug backed away from the vessel as a result of orders from Pilot Smith to pull. While pulling, the tug broke its line(s) and was dismissed by Smith (Tr. 145; Smith depo. p. 54). Smith was on the port wing of the vessel and could not see the tug from his position. He did not feel any bump of the tug against the National Defender, and no one mentioned to him that the tug collided with the vessel (Smith depo. pp. 6–10). Smith's order to the tug to pull appears to be unrelated to the collision. Baum did not testify and therefore we do not know if he signaled, or attempted to signal, the tug to back away from the vessel.

15. Hall stated that the date was September 20th (Tr. 22).

inspect the condition of the paint, observed damage to the vessel's hull.[16]

I saw an indentation in the hull of the vessel on the starboard side forward four strakes below the sheer strake, four plates aft of the bow. This plate was heavily indented and the plate below, the fourth strake below the sheer and the fifth strake below the sheer, were damaged. They were indented approximately four inches at the center and the damage extended over an area of possibly 25 or 30 foot long and 6 or 8 foot vertically (Tr. 27).

Upon detecting the damage, Hall went aboard the vessel to discuss it with Maycroft (Tr. 22). Maycroft immediately went with Hall in the launch to examine the starboard side of the bow and there observed the damage here in question. Prior to Hall's coming aboard, Captain Maycroft was not aware of any damage to the vessel (Maycroft depo. pp. 29, 34). On September 21st, Maycroft made an entry in the logbook relating to the damage; he put it on the September 3rd page without indicating that the entry was in fact made on September 21st (Maycroft depo. p. 34).[17]

Hall placed the area of damage above the twenty five foot water line (Tr.

33).[18] Maycroft testified that at the time he observed the indentations [19] they were five or six feet above the water when the draft was about 20′–06″ forward (Maycroft depo. p. 30).

The evidence shows that when the National Defender left Ras Tanura on September 4th, after loading a full cargo of fuel oil, the area of the hull in which the damage was later observed was under water and remained there until some time on September 21st when after sufficient discharge that portion of the hull once again surfaced.[20]

We must determine whether the blows struck by the Abqaiq I [21] during docking operations at Ras Tanura caused the damage to the National Defender which was observed for the first time at Sasebo on September 21st.

Maycroft and Florence were both of the opinion that the indentations were caused by the tug. Maycroft based his opinion on the following:

[T]he type of the indentation. It showed that something had raised up under the bow, and the fact that I knew the tug had been surging up and down that we used in Ras Tanura; also the size and indentations on the bow were the size of the tug at Ras Tanura.

sofar as it causes one to believe that the damage was discovered on September 3rd whereas in fact it was not detected until September 21st.

16. Hall had been assigned by the owner of the National Defender to attend the vessel upon its arrival at Sasebo to arrange for certain repairs, in particular, painting of the vessel's shell (Tr. 19).

Hall had previously inspected the hull of the vessel in July of 1961. At that time he did not observe any damage to the hull of the vessel in the area here involved (Tr. 41–43).

17. That entry reads as follows: "0900 found two indentations on strb side of the bow, caused by the tug Abqaiq surging in heavy seas while pushing vessel during docking operations between 0200 & 0300 this date. Above indentations are on 4th & 5th plates from stem & 4th plate from the sheer between frames 120 & 140. Each indentation is about 8 ft. square and six inches deep. Frames in way indentations appear bent, gaseous bunker tanks prevent examination—Examination of shell plating by Master, Ch Engr. & Chief Mate revealed no fractures—H. W. Maycroft, Master" (Ex. 2). We note that on its face this entry is misleading in-

18. Hall marked off the area of damage on Exhibit 6 (Tr. 33).

19. Both Maycroft and Florence observed two indentations on the starboard bow (Maycroft depo. pp. 29, 66; Florence depo. p. 18). Hall does not know if there were two dents; he did observe, however, two damaged plates (Tr. 68).

20. Hall testified that the damage was in the "boottopping area"—"the area that is exposed to both water and air. It's between the water line when the vessel is completely light and the water line when the vessel is completely loaded" (Tr. 32–33).

21. The tug's dimensions: 105 feet in overall length, beam 30 feet, draft 13.6 feet, displacement of 233 tons, powered by a 1,000 horsepower triple expansion reciprocating engine (Smith depo. p. 43).

* * * *

[A]t that area there is a slight angle [in the ship's plating] and it appeared like the tug had been pushing and had surged up while she was pushing, causing this indentation.

* * * *

The indentations were definitely indentations that had been done previous to our arrival at Sasebo. There was rust stains where the paint had been scraped off. However, there was no large amount of scale. It was something that had been done recently, but not too recently (Maycroft depo. pp. 30–38).

Florence was "reasonably sure" that the indentations were caused during the docking operation at Ras Tanura basing his conclusion on the following observations: the indentations were "the general shape of the bow of a tug. The construction of these tugs in Ras Tanura there which are rather blunt around the upper guardrail;" the damage would have been "detected prior to this [apparently referring to September 3, 1961] if it had occurred prior to it;" if it had been done "on arrival at Sasebo * * * the scars would have shown bright metal. In other words there would have been no rust formation or any indications of rusting;" [22] the location of the tug during docking and the location of the indentations were the same—"forward of the break of the forecastle head;" and, in terms of the vessel's draft, the two locations also "compare favorably" [23] (Florence depo. pp. 20–22, 52–53).

Virgil Hall, a consulting marine engineer and naval architect, testified that the damage he observed was "con-sistent with damage that would be caused by a tug ramming the vessel" (Tr. 46).

I base my opinion on the fact that the indentations must have been caused by a very heavy blow, by a blunt instrument. Heavy plating, it was heavily reinforced. I can conceive of a tugboat striking with enough force to cause such an indentation. There are possibly other things that could cause such an indentation, but I can conceive of that and I have had similar damages that I have observed and repaired that there was no question about how they were caused. So I base it on past experience (Tr. 47–48).

* * * *

It is consistent because I can visualize a tug striking in this area and causing this type of damage (Tr. 49).

Exhibits D–1 and E convince us that the tug's bow, covered as it was with a massive rope fender, was relatively blunt. The fender weighed between three and four tons (Tr. 111), and was in an "oval shape" (Tr. 117). A heavily woven rope mat called a moustache was placed over the fender and adopted its form (Tr. 106–07). "When the tug approached and touched a vessel, the outermost point of the oval would automatically touch the vessel first. As pressure was applied and the resiliency of the fender permitted the fender and moustache to become compressed, then progressively a larger area of the fender and moustache would become involved." When working heavily against the vessel, a six by six foot area of the tug's moustache would be pressed against the vessel's side with the major pressure

---

22. Florence described the condition of the paint work in the area of the indentations: "the paint had been through the impact of the chafing had been worn down to the metal and the metal had a light coating of rust over it" (Florence depo. p. 20).

23. Florence testified that at a draft of about 20 feet the indentations were approximately five to seven feet above the water line (Florence depo. p. 23). During docking operations at Ras Tanura, the National Defender's forward draft was nineteen feet (Ex. 2). Pilot Smith testified that the distance at the bow from the water line to the top of the Abqaiq I's moustache was approximately between eight and ten feet, and that the draft remains steady at all times (Smith depo. pp. 36–37).

area increasing toward the center (Tr. 114–18).

Hall stated that the tug would not require a high rate of speed to cause such damage since it could strike very hard on the action of the waves alone (Tr. 66).[24] It is noted, however, that while pushing the National Defender, the Abqaiq I's engines were "full ahead" (Tr. 144).

■ Relying on the preceding testimony, we are satisfied by a fair preponderance of the credible evidence that the Abqaiq I caused the damage here in question. The fact that Chief Mate Baum did not observe any damage to the hull when he made his cursory inspection over the vessel's side does not alter our determination. Baum's check was made during darkness with only the aid of a flashlight. Additionally, his position on the bow would make it difficult, although not physically impossible, for him to observe the damaged area (Tr. 52).

In reaching our determination, we have given due consideration to Captain Maycroft's failure to register a complaint at the time of the alleged collision and the lengthy delay occasioned between the date when the damage was first observed in Sasebo and the date when Aramco was given notice of it. Compare Russell, Poling & Co. v. Tug Alice M. Moran, 205 F.Supp. 874 (S.D. N.Y.1962); Henry F. Will-Lester C. Clark, 1930 A.M.C. 540 (S.D.N.Y.). Although Maycroft's letter to Aramco (Ex. A) is dated September 20, 1961,[25] it was not received until November 18, 1961 (Tr. 91–94).

We would be less than candid if we did not state that the resolution of the factual issues was quite burdensome: some issues presented very close questions of fact; the heavy reliance on deposition testimony made our task all the more difficult, for as the parties themselves recognized, much turned on the credibility of the witnesses. We are satisfied, however, by a fair preponderance of the credible evidence that the Abqaiq I did strike and damage the National Defender during docking operations.

## Negligence

■ While respondent was not an insurer, it did owe to libelant "the duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." Stevens v. The White City, 285 U.S. 195, 202, 52 S.Ct. 347, 350, 76 L. Ed. 699 (1932); see South, Inc. v. Moran Towing & Transportation Co., 252 F.Supp. 500 (S.D.N.Y.1965), aff'd, 360 F.2d 1002 (2d Cir. 1966); Grace Line, Inc. v. The C. Hayward Meseck, 150 F.Supp. 425 (S.D.N.Y.), aff'd, 248 F.2d 736 (2d Cir. 1957).

■ "When an accident occurs to the tow the action is ex delicto and the burden is on the tow to show negligence on the part of the tug." Simkins v. R. L. Morrison & Sons, 107 F.2d 121, 122 (5th Cir. 1939); Geo. W. Rogers Construction Corp. v. Tug Ocean King, 252 F.Supp. 657 (S.D.N.Y.1965). However, where a collision occurs "without any fault on the part of the tow, under circumstances in which if proper care is exercised in performing a similar service, such misfortune does not ordinarily occur there is a presumption of negligence. In other words, the situation calls for an explanation, and there is a duty on the part of the tug to offer evidence to meet the presumption." The Clarence P. Howland, 16 F.2d 25, 26 (2d Cir. 1926); The Anaconda, 164 F. 2d 224 (4th Cir. 1947); Geo. W. Rogers Construction Corp. v. Tug Ocean King, supra; Simkins v. R. L. Morrison & Sons, supra.

■ While libelant has not been able to specify with any degree of certainty in what respect(s) respondent was negligent, we are satisfied that the Abqaiq

---

24. The sea was quite choppy during docking operations at Ras Tanura (Florence depo. p. 14; Maycroft depo. p. 22).

25. The letter could not have been written on September 20th since the damage was not detected until September 21st.

I struck the National Defender under such circumstances [26] that it would not ordinarily have occurred had those in charge of the tug exercised proper care.[27]

Respondent has not rebutted the presumption of negligence arising out of this collision, nor has it offered any credible explanation of the collision consistent with the exercise of due care on the part of the tug. Accordingly, we find that respondent's negligence was the proximate cause of the damage to the National Defender.

As to liability only, the foregoing shall constitute this Court's Findings of Fact and Conclusions of Law.

The time and place for the presentation of evidence with respect to damages will be discussed with counsel at an early date.

---

26. These include the external factors of wind and sea. There was testimony to the effect that the wind was gusty and the sea was quite choppy. Captain Mohammed, however, tended to minimize the state of the wind and sea during docking operations: "It was windy, but not that strong;" and the swell was not too noticeable (Tr. 153).

Assuming that the sea was quite choppy, we are satisfied that this collision would not ordinarily have occurred had the tug exercised proper care.

27. There is no evidence indicating that those in charge of the National Defender were in any way at fault. Pilot Smith testified that he had no complaints as to the way all his orders were carried out on board the vessel (Smith depo. p. 40).