MONONGAHELA RIVER CONSOL. COAL & COKE CO. v. O'NEIL.

(Circuit Court of Appeals, Fifth Circuit. March 13, 1906. Rehearing Denied April 6, 1906.)

No. 1,442.

TOWAGE—CAPSIZING OF TOW—LIABILITY OF TUG.

A dredge boat, 80 feet long and 32 feet wide, had a crowning deck, with a horizontal opening across the bow and stern, occupying the space between the top of the hull, which was straight, and the crowning deck, varying in height from 3 inches at the sides to 9 inches in the center. When equipped with her machinery she drew 18 inches of water, leaving a freeboard below the openings of 3½ feet. While being towed by a tug on the Mississippi above New Orleans she was capsized, by having her head forced under the water, and lost all her machinery and equipment. She had no motive power, and was lashed to the side of the tug, which had full control of the navigation. She was seaworthy for her construction, and had made many trips up and down the river in safety. At the time of the accident there was a head wind blowing and the water was quite rough. *Held,* that it was the duty of the tug to navigate with reference to the obvious construction of the dredge and the conditions of the weather and water, and that the accident must be attributed to her excessive speed or want of care in view of such conditions, which rendered her liable for the loss sustained.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

Charles S. Rice, for appellant.

W. S. Benedict, J. D. Rouse, and Wm. Grant, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. The appellant claims damages for the loss of the engine, boiler, and paraphernalia of the dredgeboat Uncle Jim while it was in tow of the tug Whitewater. The pleadings and proof show: That the hull of the Uncle Jim was 80 feet long, 32 feet wide, and 5 feet deep, below deck, having a rake half-way up the bow and a square stern, built of heavy cypress timbers and planking, with combing at bow and stern 12 to 15 inches, and on both sides 12 inches above the deck. That it was equipped with a Mc-Myler 40-horse power double hoisting engine complete, a 60-horse power steam boiler, a revolving derrick, with two steel dippers for digging earth, sand or coal, a Smithvale steam pump, double-barreled steam capstan, and all the machinery and connections for a first-class dredgeboat or digger. The engines, boilers, and machinery were inclosed in wooden cabins with windows and doors. That under a contract with Jung & Sons the tug Whitewater, on December 12, 1899, took the dredge to Philadelphia Point, on the Mississippi river, above New Orleans, in order to dredge for and recover some sunken coal. That, the work having ended, the same tug, the Whitewater, on December 17th took the dredge in tow to return it to New Orleans, and had proceeded down the river about 19 miles, when the head, or bow, of the dredge was run under the water, the dredge boat was turned over, and all of the equipment was cast

into the river, and sunk in water 120 feet deep. That the hull floated and was brought to the river bank, and was, some days later, towed to New Orleans. That as early as possible the libelant, with proper assistance and apparatus, recovered most of the paraphernalia so sunken, took it to New Orleans, repaired the same, procured new parts where parts were not recovered, and restored the dredge to its previous condition. That Jung & Sons were offered and availed themselves of the privilege of inspecting the recovered property and of taking oversight of the repair and restoration of the dredge until the work was completed. That the total expense of repair and restoration was $5,059.61, besides which there was certain equipment lost, of the value of $228.19, not replaced. The particulars of the damage in detail are shown in exhibits brought up to this court in the originals.

The faults charged by the libelant are that the tug Whitewater, with the tow, was at the time of the casualty proceeding at an excessive and dangerous rate of speed in a bend in the river, where, owing to the wind and current, the river was very rough and the waves high. The libelant alleges that its dredge and the equipment thereof was thoroughly seaworthy, and its employés thereon were wholly without fault. The claimant avers that it was owing to the negligence of the master, officers, and crew of the dredgeboat that the dredge filled with water and sank, head downwards, into the river, and that the accident was due, also, to the unseaworthiness of the dredge, which unseaworthiness was unknown to the tug and its officers. They specify that the dredgeboat had at its bow a horizontal opening 30 feet long, and ranging in width from 4 inches at each end to 9 inches in the center, across the entire bow of the dredgeboat. That half an hour before the accident the master of the dredge had requested the master of the tug to stop while he placed a plank over the ventilator or opening in the bow of the dredge to prevent the water entering into the hold, and having partially nailed and further tying the plank to the bow to keep it in place he requested the tug to proceed. That shortly afterwards the tug shifted from the starboard to the port side of the dredge to take on some coal, which necessarily caused a stoppage of the forward movement, and that after tying again to the dredgeboat proceeded to take on the coal, but had barely got to work, and was slowly moving down stream in an even current, when the dredgeboat went down beneath the water. This result is averred to have been wholly caused by reason of the water in the hold of the dredge being forced forward by such stoppage, causing the bow to sink. It is also averred that the siphon used by the dredge to keep the hold free from water had ceased to operate at the time that the change of the position of the tugboat was made necessary in order to obtain coal for the purpose of navigation. It is further charged that none of the officers or crew of the dredgeboat were on its deck at the time of the accident, but were playing cards in the cabin. It is insisted that the lost machinery was recovered at an unnecessary and wanton expense, and that the dredgeboat was put into condition equal to new for the benefit and

advantage of its owners, and for which respondent is not liable. The evidence was taken before a commissioner and the oral testimony reduced to writing by a stenographer. It is marked by the customary conflicts that characterize testimony offered on the trial of issues in admiralty. The District Court dismissed the libel, with costs.

The hull of the dredgeboat had a flat bottom and a rounded rake extending half-way up the bow. Above the hull was a rounded deck, having a 12-inch crown in the middle, from bow to stern. The deck is so built as to leave an opening at the bow and the stern, occupying all the space between the top of the hull and the planking of the deck, making it three inches high on each side and nine inches in the middle. These openings are as obvious as the dredge itself. In and on the dredge were the dredging paraphernalia—boiler, engine, foundation, derrick, buckets, etc. Six feet from the bow is a bulkhead, water-tight, to the height of the hull, but the space above the hull to the deck is open. With all its machinery and paraphernalia on board the dredgeboat draws 18 inches of water, thus leaving a freeboard the height of the hull, $3\frac{1}{2}$ feet. The dredge appears to have had no locomotive machinery or steering equipment. Under a contract with Jung & Sons, who appear to have then controlled the steamtug Whitewater, the respondent in the libel, the dredgeboat was taken in tow by the Whitewater at New Orleans, on December 12, 1899, and taken to Philadelphia Point, 80 miles above New Orleans. The engineer of the tug Whitewater testifies that there was no trouble during the up trip, and that on the trip up the speed made was an average of $2\frac{1}{2}$ miles an hour. On December 17th Englisbee, who was in charge of the dredgeboat, notified Whitman, the master of the Whitewater, that he wished the dredge towed back to New Orleans, and early in the afternoon of that day the Whitewater took the dredge in tow and left Philadelphia Point for New Orleans. After having proceeded 9 or 10 miles down the river, Englisbee noticed that splash water was dashing against the bow of the dredge and getting into the ventilator or opening. He thereupon had a plank, 3 inches thick, 29 feet long, and 12 inches wide, prepared to cover the opening, and when it was ready he told the officer of the tug to slow up so that he could hang the plank over. With only a few minutes' delay, the tug proceeded down the river, until the master of the tug shifted it from the starboard to the port side of the dredge to take from the dredge some coal from its port side, near its head. With a little delay on this account, the tugboat was again "hooked up"—i. e. put on her former speed—and 10 or 20 minutes thereafter, having entered the reach in the river between Whitehall and Brilliant Point, and, being in the bend of the river and near the west bank, a strong wind was encountered, blowing nearly up the reach, but quartering somewhat across from the east shore, and making a very rough river. The tug not lessening her speed, the head of the dredge was driven under the waves, and she made a complete somersault, turning bottom side up and spilling into the river all her machinery and paraphernalia, except

that permanently fastened to the hull. The dredge at the time of the catastrophe was the exact counterpart of her predecessor, having been entirely renewed as to her hull in 1899 and thoroughly repaired as to her equipment. Before this catastrophe she and her predecessor had made numerous trips on the Mississippi river in tow of tugs, in and about the harbor of New Orleans, to Donaldsonville, Baton Rouge, and once to Natchez, wherever there was work for her, without accident or mishap. The proof does not show any defect in her construction, other than the opening at the bow and stern between the head blocks of the hull and the crowned deck before referred to; the opening representing in its width exactly the distance between the head blocks and the deck. There is no proof that the siphon was not in working order and was not given proper attention. As we view the proof, there is nothing in it to indicate that either the manager, Englisbee, who was in charge of the dredge, or any of the employés thereon, were at all guilty, either by commission or omission, of any negligence contributing proximately or remotely to the disaster. As the evidence shows, and in the very nature of the case, such a construction as this dredgeboat has a tendency when pushed through water too rapidly to dive or put the head thereof under the water, but it does not show any unseaworthiness when propelled at a speed proportioned to the requirements of its obvious construction and to the conditions of the weather and of the water in which it is navigated. The employés of the libelant who were on the dredge were not in any manner charged with the propelling or steering or navigation of the tow. It was lashed alongside the tug, with its deck so located that, while under way, a laborer could with a wheelbarrow move coal from the deck of the dredge to the deck of the tug. Persons on the deck of either could pass easily on to the other. As to the navigation, therefore, the dredge and the tug were then one vessel and under the exclusive control of the master of the tug.

Capt. Joseph O'Keefe, who was at the wheel and in charge of the tug on this run, says that, when they left Philadelphia Point, the wind was light, about 10 miles an hour, blowing from about southeast, and made choppy swells; that at the time of the sinking of the dredge they were entering on a reach of the river which runs from about south by east to about north by west, the wind being a little off the east shore and striking the tow on the port side; that just before the bow of the Uncle Jim went under the state of the river was a little choppy, but not very much; that there was then and there on the way down the river a tug with loaded coal boats in tow; that such tows are frail and have to be handled carefully; that (with such a tow), if the waves on the river are too high, "you have got to go to the bank until they subside, but just choppy swells you can go through them"; that this was about a half hour on a little more after the time that the tug had been slowed up to have the plank put over the venthole of the dredge. In connection with having put the plank over the ventilator, he says:

."Well, Mr. Englisbee said it was all right, so then we hooked up again. Well, we got, I suppose, about three or four miles from there and Capt. Whitman got up and said let us change sides and coal up the tug, take some coal off the head. The dredge was a little heavy by the head. He took the wheel and told me to handle the lines. * * * So he changed sides, and he called me the moment we hitched up to the dredge, and he said: 'Hold her a while, I want to go back aft to the closet.' And I took the wheel, and there was a little fellow rolling coal from the head of the dredge on the tug, and I was watching him rolling the coal off the dredge, and I noticed how deep she was, she was going down a little, so I asked the fireman if there was any water in the hold. The fireman poked his head out of the engine room and, said the siphon had just blew, he just shut it off. You know a siphon can blow with about 8 or 10 inches of water or two feet or more in the hold, if they don't have sufficient steam to raise the water, or if it is clogged up. Well, I noticed she kept going down about an inch further, so I stopped her and backed and hooked her up, then I gave three whistles to stop and back her. At that time I saw that she was going under. Her head had done started under."

On cross-examination he was asked:

"Q. You say that you noticed that the dredge was going down? A. Yes, sir. Q. Where did you notice that? A. On the port side of the dredge. We generally take a mark in towing anything like that, and that always tells us if they are making any water. Q. I asked you where in the river it was that you noticed that? A. That was about opposite Whitehall Point. Q. That was where the accident happened. A. Yes, sir. Q. How long before the accident? A. Well, I suppose about a minute and a half or two minutes."

The answer to the libel avers that the tug had proceeded at an average speed of seven miles an hour with the current. The distance from the point of departure to the point where the dredge sunk is 18 or 19 miles. The testimony of the master as to the time of departure and the time of the wreck makes the time they were running three hours. Other testimony entitled to equal weight lessens that time one-third. But this is not material, as its only use is to show the rate of speed, and there is no reason or precedent fixing a given rate of speed per hour which may safely be applied to all conditions. The rate of speed, whether it be six or nine miles per hour, which under existing conditions will put the head of such a tow under water, is dangerous and excessive with that tow in those conditions. The tug with coal boats which was seen ahead of the Whitewater at the time of the sinking of the Uncle Jim was the Carrie B. She had four loaded coal boats in tow. She had taken them that day from Ascension Coal Fleet, a point about three miles below Philadelphia Point, for New Orleans. She had started early in the morning. She was in command of Capt. John G. Davidson, who testified that, when he started, the weather was pretty calm, but that the wind blew quite a breeze before he got down to Whitehall (where the accident occurred); that at the time he passed Whitehall the condition of the wind and of the river was pretty rough; that, when he passed through the reach on the lower end of Whitehall plantation and continued down toward Brilliant Point, the water was pretty rough, and there was quite a lump of a swell in the river at that time; that the wind was blowing from east or nearly east directly up that reach; that it is nearly an east and west reach;

it might be a point out of the way or a fraction over; that he kept his tug and tow on the east side, the weather shore, to keep out of the swell; that it is difficult to tell or guess at the height of the waves; that they probably rolled up two or three feet or higher; that the river is not at all times in that condition; when the wind is not blowing, it is not. Being asked:

"Q. What was the stage of the river at that time, the current? A. Very low. Q. And the current? A. There was scarcely any current. There was a little current in the bends."

He says he was present and helped to get up the machinery of the Uncle Jim that was raised; that the point at which this machinery was found and from which it was raised was close in the bend of the river, about 500 feet from the west bank; and that at this point the river is between 2,000 and 2,500 feet wide.

It is unnecessary to incumber this opinion with a minute statement of the testimony. We conclude from a careful consideration of all the testimony that it affirmatively shows that there was no accumulation of water in the bulkhead of the dredge such as to have caused or appreciably to have contributed to the putting her down by the head, or to the disastrous result that occurred. In the conditions shown by the proof in this case the master and other employés on the tug were in full charge and control of the dredge on this voyage, and the claimant is liable in damages to the libelant who has been injured by the want of reasonable care and skill on the part of his employés in charge of the tug in towing the dredge. The Express (Justice Nelson) 1 Blatchf. 368, Fed. Cas. No. 4,596; Sturgis v. Boyer, 65 U. S. (24 How.) 110, 16 L. Ed. 591; The Quickstep, 76 U. S. (9 Wall.) 665, 19 L. Ed. 767; The Margaret, 94 U. S. 494, 24 L. Ed. 146. The cases cited by the proctors for claimant are not in conflict with the view we have announced. The damage inflicted on the libelant is clearly shown in the exhibits, which constitute a part of the record, and is supported by a preponderance of the proof.

It follows that the decree of the District Court must be reversed, and a decree here rendered in favor of libelant, Monongahela River Consolidated Coal & Coke Company, and against the claimant, W. W. O'Neil, and the sureties on the release bond, L. A. Jung and L. E. Jung, in solido, for the amount of damages claimed in the libel, and for the costs in the District Court and in this court.