**MOBILE TOWING & WRECKING CO.,**
Inc., an Alabama corporation,
Libelant,

v.

**A DREDGE,** property of Gulf States
Dredging Company, Inc., a Flor-
ida corporation, Libelee.

**A DREDGE,** property of Gulf States
Dredging Company, Inc., a Florida
Corporation, Cross-Libelant,

v.

**MOBILE TOWING & WRECKING CO.,**
Inc., an Alabama corporation,
Cross-Respondent.

**Civ. A. No. 976.**

United States District Court
N. D. Florida,
Tallahassee Division.

May 8, 1969.

Dewey R. Villareal, Jr., of Fowler,
White, Collins, Gillen, Humkey & Tre-
nam, Tampa, Fla., for Mobile Towing.

Paul A. Louis and Bertha Claire Lee, of Sinclair, Barfield & Louis, Miami, Fla., for a Dredge, property of Gulf States.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### PREFACE

CARSWELL, Chief Judge.

In the predawn blackness of October 2, 1963, an unnamed and unmanned derrick barge in tow simply vanished from the face of the sea. This tale of the vanished vessel has an aura of mystery which only the open sea can conjure but lacks the elements of heroism and cruelty which would inspire a Conrad or a Hemingway. It is a mini-saga of the sea scarcely rendered less mysterious by the necessity of this Court to glean from the evidence the probabilities of what happened. With a few more facts—which are not on the record—and with a less formal and restricted format, this might well be the subject of an intriguing short sea story. As it is, however, with renewed respect for the reputation of the sea for guarding its secrets well, and this Court being confronted with the explicit requirements of Rule 52, the following findings of fact and conclusions of law are hereby entered.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A derrick barge disappeared in the Gulf of Mexico about 25 miles west of Anclote Key at approximately 5:30 A.M. on October 2, 1963. Before the loss the barge, along with the dredge CHICKASAW, was in tow of the tug COMMODORE on a voyage from Boca Grande, Florida, to St. Marks, Florida. The dredge CHICKASAW, and the derrick barge, nameless and numberless, were owned by McCullough Industries, Inc., and had been since May, 1962, bareboat chartered to Gulf States Dredging Company, Inc. The tug COMMODORE was owned by Mobile Towing & Wrecking Company. The towage was undertaken pursuant to a contract between Gulf States and Mobile Towing.

This litigation was commenced by the filing of a libel for tow hire by Mobile Towing against the dredge CHICKASAW. Gulf States answered the libel, as owner pro hac vice of the dredge, and filed a cross-libel against Mobile Towing claiming damages for the loss of the derrick barge, the loss of use of the derrick barge and other incidental expenses, asserting negligence on the part of Mobile Towing as the basis of recovery. Mobile Towing answered the cross-libel denying negligence and denying liability to Gulf States.

On September 8, 1967, the Court entered an order confirming its ruling at the pre-trial conference in favor of libelant Mobile Towing and against the libelee dredge CHICKASAW and Gulf States providing that the libelant had prevailed in its contract action for tow hire and was entitled to recover tow hire in the amount of Five Thousand Eight Hundred Thirty-Eight and 53/100 Dollars ($5,838.53), together with costs in the amount of Seventy-Nine and 08/100 Dollars ($79.08) and a reasonable attorney's fee in the amount of One Thousand Dollars ($1,000).

The case was tried upon numerous depositions and the testimony of some ten witnesses who appeared in person at the trial.

Inter alia, the following facts were stipulated to by the parties:

"On 1 May 1962 Gulf States Dredging Company, as Charterer, entered into a Barge Charter Party with McCullough Industries, as owner, for the hire of the Dredge Chickasaw and 'attendant Plant', including the unnamed derrick barge described in said Charter as 'Steel Derrick Barge 25'6" x 66'8'3"' (Stip. (a) p. 2)."

"On 1 October 1963 the Tug Commodore took the Dredge Chickasaw and an unnamed derrick barge in tow at Boca Grande, Florida, and proceeded towards St. Marks, Florida. The tow had previously been brought to Boca Grande, Florida, by another tug ar-

ranged for by Gulf States Dredging Company." (Stip. (f) p. 21)

"The tow hawser from the Commodore to the Chickasaw was of two-inch diameter wire and was so adjusted that its length was between 800 and 1,000 feet. The intermediate hawser connecting the Chickasaw and the derrick barge was of eight-inch circumference nylon rope approximately 1,000 feet in length. Two-inch diameter wire two-legged bridles, approximately 70 feet in length, connected the main tow hawser to the Chickasaw and the Chickasaw to the hawser leading to the barge. 45-foot bridles connected the derrick barge to the intermediate hawser." (Stip. (1) p. 4)

"On 3 October 1965 the Dredge Chickasaw was delivered by the Tug Commodore and Mobile Towing and Wrecking Company to Gulf States Dredging Company off the entrance of St. Marks, Florida." (Stip. (h) p. 4)

"The exact times of getting under way, arriving, etc., are as noted in the log book of the Tug Commodore. * * *

4. Tug Commodore secured to tow 10/1/63, 0810 hours;

5. Tug Commodore under way with tow 10/1/63, 0950 hours;

6. Tug Commodore and tow took departure off Boca Grande, 10/1/63, 1118 hours.

7. Personnel on Tug Commodore advised by radio by personnel on Dredge Chickasaw that derrick barge was missing 10/2/63, 0545 hours."

(Stip. (i) p. 3)

The daily dredge reports show that the derrick barge and the dredge CHICKASAW left the job at which they had been working in West Palm Beach on or about September 21, 1963, and were towed to Punta Rassa, near Fort Myers, Florida, through the inland waterway, by another towing concern. The flotilla arrived at the Punta Rassa area on September 24, 1963, and remained there until September 30, 1963, when the tug BELLE OF MYERS, owned by a third towing company took the dredge and the barge in tow to bring them to Boca Grande, Florida, where they arrived early on the morning of October 1, 1963. During the layover at Punta Rassa the dredge and the barge were made ready for the prospective tow to St. Marks, Florida. The layover period was protracted because of heavy weather in the Gulf of Mexico. All concerned seem to have agreed that the voyage to St. Marks should not commence. The tug COMMODORE was at Boca Grande, Florida, from September 27, 1963, awaiting the arrival of its tow and improvement of the weather.

The derrick barge had been drydocked in August, 1963, at Lantana, Florida, at which time her bottom was scraped and painted and certain routine repairs were accomplished. Home Insurance Company Surveyor Kirby Roberts testified upon deposition that at West Palm Beach he examined the derrick barge with a view to ascertaining her fitness for the impending tow in the Gulf. Several days prior to September 30th, while the derrick barge was at Punta Rassa, he inspected her again and recommended certain further work to ready her for sea. On at least one occasion when Roberts was on board the derrick barge, Captain Edward F. Quinn, Master of the tug COMMODORE, was also present on the barge and made suggestions for additional pre-voyage preparations. The recommendations for pre-voyage preparations were carried out. It also seems to be uncontroverted that the derrick barge appeared to be seaworthy and fit to make the tow and was so considered by all of those who examined or saw her prior to departure. (Roberts' deposition pages 40, 52, 53; Quinn deposition pages 13, 14, 76; Wilson depositions page 25; Johnson deposition pages 102, 103.)

The flotilla was rigged for the tow at anchorage at Boca Grande, Florida, on October 1, 1963. The dredge CHICKASAW, which was to be the lead vessel in the tow, was connected to the COMMODORE'S tow hawser by two steel wire

bridles approximately 70 feet in length which in turn connected to the COMMODORE'S two inch diameter steel wire hawser which was on a towing winch on the tug COMMODORE. An identical set of bridles were placed on bitts on the after end of the dredge and connected to one end of an 8 inch circumference nylon tow hawser 1,000 feet in length. On the other end of this nylon tow hawser was an identical set of bridles which in turn were made fast to bitts on the rake end of the derrick barge. The eyes of these latter bridles were put over both horns of the respective bitts and 3 inch circumference mantilla tail lines approximately four fathoms in length were figure-eighted around the bitts and half hitched so as to prevent the bridles from coming off the bitts under normal conditions. The nylon tow hawser itself was faked down on the derrick barge, free for running. At the time of connecting hawsers the derrick barge was made fast alongside the dredge CHICKASAW.

Upon getting underway with the tow, the COMMODORE paid out approximately 300 feet of towing wire and took the flotilla through the narrow part of Boca Grande Harbor entrance. After this, upon signal from the COMMODORE, the crew of the dredge cast off the lines holding the derrick barge alongside the dredge and the COMMODORE proceeded to tow the dredge toward the sea with the nylon hawser paying off from the derrick barge until the full hawser length was extended. There is a conflict in the evidence as to the speed at which the COMMODORE proceeded while streaming the nylon hawser. The man in charge of the riding crew on the dredge, August Johnson, estimated the speed at 6 to 7 miles per hour and testified that the derrick barge was given a strong jerk by the intermediate hawser when it was fully extended. (Johnson deposition pages 41, 43, 44.) Chief Mate A. F. Wilson of the tug COMMODORE testified that the tug was proceeding at a speed between 1 and 2 knots, just sufficient to maintain steerageway, and that there was no unusual jerk or twist of the derrick barge when the nylon intermediate hawser came to full extension. Captain Victor Wendt, master of the tug BELLE OF MYERS, who was approximately 300 feet from the derrick barge during the streaming operation, and thus considerably nearer than any other witness, and waiting to take a member of the riding crew off the derrick barge when the hawser had been extended, testified that when the hawser took up slack the derrick barge gradually swung around and straightened up; that the hawser did not come out of water; that the job was done about as easily as it could be and that the hawser came tight without any undue strain, twist or jerk. Captain Wendt noticed that the engine of the COMMODORE sounded as though it were running slow. (Wendt deposition pages 5, 6, 7, 18, 19, 20.) The Court finds there was no undue strain, jerk or twist sustained by or imposed upon the derrick barge in the course of getting underway at Boca Grande.

For the voyage from Boca Grande to St. Marks, the COMMODORE paid out between eight and nine hundred feet of its steel wire hawser so that approximately 900 feet separated the tug from the dredge, and approximately 1,150 feet separated the dredge from the derrick barge. This was a proper and seamanlike towing arrangement. (Quinn deposition page 41; Wilson deposition page 23; trial testimony of Captain De Rocher and Captain Luther Johnson; Roberts' deposition pages 23, 24; Johnson deposition pages 125, 128.) The Court finds this was a proper and seamanlike towing arrangement.

The thrust of Gulf States' charge is that the tug was negligent in not adjusting to the special circumstances of the tow. Specifically, Gulf States contends that, in the light of the tug's knowledge that the barge continually yawed and was "down by the head," the tug was negligent in towing the barge at an excessive and unchanged speed or in not changing course, even though the winds freshened and the seas roughened.

With only one important exception (the weather), there is remarkably little difference in the evidence concerning certain aspects of the tow. Everyone agreed that prior to beginning the passage, the derrick barge was "down by the head". Although the evidence conflicts as to how much, everyone agreed that from the beginning of the journey until its loss, the barge yawed. Those aboard the dredge described the yawing as 200 feet each way, while the tug's crew perceived the yaw as "slight" or "usual". The tug's crew placed the average, overall speed at 5½ knots.[1]

Everyone agreed that at whatever average speed the tug travelled, that speed was never diminished—even after the loss of the derrick barge and after the dredge CHICKASAW began listing and taking on water.

There is no dispute as to the course chosen by Captain Quinn. Up to the Tampa sea buoy the flotilla stayed close to shore; thereafter the tug and its tow headed straight across the Gulf for St. Marks. Captain Quinn acknowledged that as the flotilla moved farther away from the shelter of the shore, the tow naturally encountered more effect from the existing wind and seas.[2]

■ There is no disagreement that even after the loss of the barge, between 5:25 and 5:45 A.M. on October 2, 1963, and the trouble encountered by the dredge CHICKASAW, there was no change in direction until 11:45 A.M. that day—a period of 6 hours.[3] It was not until the dredge CHICKASAW was in imminent danger of foundering that the tug changed its course and the change was at the request of the dredge master. When the course was changed towards shore, the danger to the dredge subsided.[4]

There is unanimity that the make-up of the tow was proper; that her lines were sufficient and securely fastened; that the wind and the seas were calm at the beginning of the passage. It is also uncontradicted that when the hawser to which the barge had been attached was examined in St. Marks *it was found to be in perfect condition.*

There is marked disagreement, however, as to whether there was a change in the wind, causing increased seas and swells. Summarizing the evidence: The log of the dredge CHICKASAW reflects that on October 1, 1963 at 10:30 P.M. Gus Johnson made this entry: "Rough seas." The log of the COMMODORE for October 1, 1963, beginning at 4:00 P.M. through midnight, contains these entries by chief mate Wilson: "1600 wind SW calm; 1600 partly cloudy, calm; 2000 wind *NE* Force 2-3 Sea NE, Mod.—2000 Pt. cloudy, Mod. N.E.,ly sea and *swell*. 2400 wind E.ly force 4 sea E.ly, Mod.; 2400—O'cast, Mod. E.ly breeze, Mod. E.ly *sea* and *swell*."

---

1. The very fastest the tug could travel was 7 knots. To the dredge crew the pace seemed faster—"8, 9 miles an hour."

2. At page 79, Captain Quinn explained: "You see, when you leave Tampa sea buoy you are getting farther out from the shore, away from the lee of the land, so naturally the wind would tend to indicate. Now the wind might not actually increase, but as you get further away from the shelter of the shore you would begin to feel a little more effects from it, from any breeze or wind that might be in effect. So there was some change, yes, in the velocity that would have been logged after you began to get a little farther away from the lee of the shore."

3. Second mate Edmonds noted the change at 1:45.

4. The chart in evidence (MX 8) shows the tug's course at the time of the loss to be approximately 8 nautical miles west of the 10 fathom line (60 feet deep), and approximately 20 nautical miles west of the 3 fathom line (18 feet deep). The Commodore's log reflects that her draft is 12 feet (MX 12). The Court takes judicial notice that the tug could not have safety travelled closer to shore than the 3 fathom line. According to the chart (MX 8) there were no depth hazards which would have prevented the tug from a course no further west than the 3 fathom line; under the prevailing conditions, there could be no claim of wind hazard causing a shoreward drift to treacherous shallows.

Captain Quinn stated that as the flotilla got offshore "there was some slight increase in the velocity" of the wind. At 5:45 A.M. on October 2, 1963 when the loss of the barge was discovered, the COMMODORE logged the wind at ENE 10–12 knots, 2–3 foot seas, small swells.

Chief mate Wilson of the tug, who had the 4 to 8 watch morning and night, stated that his log entry at 8 o'clock was "partly cloudy, moderate northeasterly sea and swell." The wind was between 10 and 12 knots or "maybe as much as 15"; that waves were not over "2 or possibly 3 feet high." At his next watch at 4:00 A.M. (1½ hours before the barge disappeared) Wilson observed that the winds were roughly 12 to 15 knots again with no change of sea. Wilson stated there was "no appreciable change" in the weather from the time the tow left Boca Grande until the barge was lost.

At 4:00 A.M. on the morning of October 2, 1963, second mate Edmonds' entry in the log read: "0400, partly cloudly, moderate easterly sea and swell and wind force three to four." [5]

Gus Johnson, dredge master, described the weather. In his log, Johnson noted at 10:30 P.M. on October 1, 1963 "rough seas." Several years later at his deposition without benefit of his notes to refresh his memory, he stated that the wind starting picking up around midnight that night, and that he and Hildebrand figured the velocity at 20 miles per hour; that "it just got rough" and the waves got up to "about 6 foot." The dredge started taking on water between 3:00 and 4:00 A.M. of the morning the barge was lost.

Kirby Roberts, the marine surveyor who approved both the dredge and the barge for insurance just prior to departure on October 1, 1963, went to Mobile, Alabama, on October 10, 1963,

to check the hawser after the barge was lost (believing the barge to be insured and expecting a claim for its loss by Gulf States). While in Mobile, Captain Quinn told Kirby Roberts that when he got up the coast the wind had picked up to 15–18 miles per hour, causing "rough seas" [6] with 3 to 4 foot waves. Roberts' written report dated October 30, 1963, made in the regular course of business and attached to his deposition corroborates his deposition.

At the trial, Gatlin Hildebrand, diesel engineer aboard the dredge CHICKASAW, testified that at the beginning of the towage, the weather was very nice with seas of 1½ to 2 feet, but that in the afternoon of October 1, 1963, the seas and the wind started picking up, increasing through the night—that the waves were breaking up so high, they couldn't open the doors on the dredge; the waves were over 6 feet and didn't subside.

Finally, Dr. J. G. Stevens, Professor at the University of Florida, an expert on behalf of Mobile, reconstructed from a series of geodetic charts the condition of the winds and seas in the vicinity of the tow's path on the days in question. Said Dr. Stevens, "At 7:00 A.M. on 1 October very light wind, Beaufort force 2 equals 7–11 knots, at 1:00 P.M. 10 knots, at 7:00 P.M. on 1 October winds east northeast at 15–16 knots or 18–20 miles causing swells. Ships 200 miles to the west observed 5-foot waves. At 1:00 A.M. on 2 October east northeast, 10 knots 3–5-foot waves, 7:00 A.M. east northeast 10 knots." Dr. Stevens' testimony was consistent with the testimony of the dredge crew as well as the log of the COMMODORE.

At the time of the discovery of its loss, no attempt was made to locate the derrick barge, although Captain Quinn later told the Coast Guard and Kirby

5. Edmonds explained: "Over here, there's "Force three to four", that could moderate, that would be seas maybe two to three feet high, something like that, it's moderate."

6. When asked whose term is "rough seas", Roberts replied "Captain's term."

Roberts that he had circled to look for the missing equipment. Had the seas been calm, the failure to make even a token attempt to locate the barge in and of itself would be evidence of poor seamanship [7] since an object as large as a derrick barge floating loose at sea can be a hazard and a menace to navigation. Therefore, from a careful analysis of the logs, other exhibits and all the testimony, the Court finds that, regardless of the degree of change, there was undoubtedly an increase in the velocity of the wind and the size of the seas prior to the loss of the barge.

 Mobile contended that the crew aboard the dredge CHICKASAW was contributorily negligent. The law places upon the captain of the tug the duty to give proper instructions for the management and safety of the tow.[8] As First Mate Wilson noted, the men aboard the CHICKASAW were not seamen, but worked the dredges inland and some had never been to sea. The record reflects only the most general and cursory instructions to the crew by Captain Quinn. The Court holds the captain's failure to instruct the dredge crew with particularity is evidence of negligence.

Two experienced tug masters testified as experts: Captain Luther Johnson for Mobile and Captain M. A. Des Rocher for Gulf States. In response to Mobile's hypothetical question assuming wind force 3–4 Beaufort resulting in 3–4 foot waves, Captain Johnson considered 5½ knots speed a good speed. Captain Johnson stated that yawing is natural in light tows and never leads to tripping and he considered seas of 3–4 feet and winds 10–15 knots calm weather. Captain Johnson was of the opinion that the derrick barge sprung a slow leak which caused her to sink.

On the other hand, Captain Des Rocher emphasized the tug master's duty to adjust to the special circumstances of each tow—emphasizing the need to proceed with caution where, at the commencement of the towage, the barge was "down by the head" and yawing. Captain Des Rocher postulated that if the tow is pulled too rapidly, water piles up in front of the rake end—especially where the barge is "down by the head" and yawing—causing the barge to either trip or dive nose down, resulting in breaking the tail ends attached to the eyes of the bridle and causing the hawser to slip off the bitts. Captain Des Rocher stated that if the winds increased from 10–12 knots to 18–20 knots and seas from 2–4 to 4–6 feet, with a light barge "down by the head", in his opinion, not reducing speed from 5½ knots or changing courses was poor seamanship and resulted in the sinking of the derrick barge, either from flipping over or diving nose down, breaking loose and continuing to dive straight down very quickly until lost.

The record negates any inference supporting Captain Johnson's premise of a slow leak. The members of both crews, up until minutes before the loss of the barge, observed no signs of any breach in the watertight integrity of the barge. Chief Mate Wilson observed her at 5:00 A.M., 45 minutes before her loss was reported, and he saw both her red and green lights. Prior to that, Second Mate Edmonds, who had the midnight to 4:00 A.M. watch, also observed both lights and stated that "she is riding fine, towing easily, neither rolling or pitching." [9]

In explaining the sinking of the derrick barge, Mobile's witnesses are of the opinion that the sinking occurred as a result of the derrick barge developing a slow leak. Gulf States takes the position

---

7. See The Anaconda, 164 F.2d 224 at 226 (4th Cir. 1947), for the significance of fabricating evidence. Before the Coast Guard and Kirby Roberts, Captain Quinn undoubtedly felt guilty for not having attempted to locate the barge.

8. The Robert H. Cook, 26 F.2d 710, at 712 (N.D.N.Y.1928).

9. Although the Court does not consider it significant, there is a conflict in testimony as to the lights on the barge. The tug crew observed both a red and green light while the dredge crew saw only a green light.

that the sinking occurred quickly either as a result of the barge's flipping over or diving nose down as opined by Captain Des Rocher.

No man knows exactly what happened. The Court is of the opinion, however, that the sinking did not result from the slow entry of water into the hull of the barge. The preponderance of the evidence and all reasonable inferences therefrom indicate that the loss of the barge resulted from a sudden occurrence such as its flipping over or diving nose down, causing the barge to break the mantilla tailends securing the bridle to the bitts as evidenced by the almost perfect condition of the hawser, after the loss of the barge. In this connection the Court is impressed with the logic of the testimony of Captain Des Rocher. It seems more credible in its import than the other theories postulated by other experienced seamen.

█ The Court concludes that the sinking of the barge was caused by the excessive speed of the towage or the failure to change course in the face of increased winds and seas where the barge was a "tricky or cranky" tow being "down by the head" and yawing. Therefore, it follows that the tug did not perform its duties with such reasonable care and maritime skill as prudent navigation required under the circumstances.[10]

This conclusion is further supported by the Record wherein it appears that although the dredge CHICKASAW with waves breaking over its sides also got into serious difficulty about the same time, no change of speed was ever made and no change in direction toward shore was made for a period of six hours.

As stated in Geo. W. Rogers Construction Corporation v. Tug Ocean King, 252 F.Supp. 657, at 665 (S.D.N.Y.1965), citing our Fifth Circuit Court of Appeals:

> The situation presented herein is similar to that presented in Monon-

gahela River Consol. Coal & Coke Co. v. O'Neil, 144 F. 74 (5th Cir. 1906) where a flat bottom boat with a derrick and other machinery on her main deck suddenly "made a complete somersault, turning bottom side up" when the head or bow of the dredge was run under the water as a consequence of being towed too fast. The Court initially noted that the towing characteristics of such craft required special care:

> "As the evidence shows, and in the very nature of the case, such a construction as this dredge boat has a tendency when pushed through water too rapidly to dive or put the head thereof under the water * * *." Id. at 77.

In holding the tug solely at fault the Court said:

> "The rate of speed * * * which under existing conditions will put the head of such a tow under water, is dangerous and excessive with that tow in those conditions." Id. at 78.

Accordingly, based on the aforesaid considerations and conclusions, Gulf States is entitled to recover for the loss of its derick barge.

Remaining is the issue of damages.

█ The applicable law of damages is succinctly stated in Carl Sawyer, Inc. v. Poor, 180 F.2d 962 (5th Cir. 1950):

> (1) All agree that the usual and customary method in determing damages in cases of maritime collision is the market value of the vessel in the case of loss. See Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890. But in cases where no market value has been established by recent and comparable sales other evidence is admissible touching value such as the opinion of marine surveyors, engineers, the cost of reproduction, less depreciation, the condition of repair which the vessel was

10. The Admiral, 84 F.2d 616 (5th Cir. 1936; Curtis Bay Towing Co. of Virginia v. Southern Lighterage Corporation, 200 F.2d 33, at 34–35 (4th Cir. 1952).

in, the uses to which it can be put, the amount of insurance that the underwriters have issued, and the like.

The evidence adduced at the trial with respect to the value of the lost barge and its equipment and appurtenances varied widely, from a low of $10,000 to a high of $47,600.

The low estimate of value was made by a witness for Mobile, Arthur Darden, a naval architect and marine engineer of vessels for purchase and insurance. He placed a fair market value of the derrick barge in 1963 at $10,000 and it was based solely on the cubic numeral at a price per pound of 85¢. He did not take into consideration the condition of the equipment nor did he state the value of each individual item that was used to assemble the derrick barge. He placed a value of $5,000 on the hull and $5,000 on the other equipment aboard the derrick.

Four witnesses testified in behalf of Gulf States on the issue of damages. Joseph McCullough, President of Gulf States at the time of the loss, placed the value of $43,600 for the barge and its equipment. Broken down, he summarized it by placing $20,000 value on the barge hull and some $23,600 on all the appurtenances, including deckhouse, derrick, sheaves and blocks, hoist engine and control, and included material and labor to assemble in the amount of $4,000.

Gus Johnson gave a total value to the equipment on the derrick of $3,200.

Niel Atkinson, operations manager for Gulf States at the time, placed a market value on the entire plant of $30,000–$40,000, and stated that he would gladly have paid $30,000 for it, but if the seller was "tied up and wanted to sell it in a hurry * * * he probably couldn't have gotten over twenty for it, if that much."

Gus Johnson, master of the dredge at the time of its loss and presently part owner of a dredging company testified to an overall value lost of $47,600.

James Wilkinson, a marine surveyor and insurance appraiser, gave an overall value of $42,700.

Summarized, McCullough estimated the replacement cost of the barge at $43,600. Atkinson placed a fair market value thereon between $30,000–$40,000.

While there is evidence on the record that the cubic coefficient technique of correlating the value of the derrick barge to that of vessels of somewhat different sizes is an accepted manner of establishing value for insurance and for purchase—sale purposes, the Court concludes that Mobile's witness' estimate was low in considering all of the evidence before the Court. By like token, the evidence presented by Gulf States as to value varies considerably from item to item and with respect to some of the items the values were given as guesses and therefore lack considerably in probative value. (Atkinson's deposition.) Moreover, some of the figures used were replacement values and not fair market value at the time of the sinking. (McCullough's deposition.) The record does not show any documentary evidence of the purchase price of the barge, the value at which it was carried as an asset, the value at which it was returned for taxes, the value for which insured in earlier years or insurable at the time of the loss or the cost of labor, materials used to modify with a different derrick outfit about 1958.

■■ After a careful study of testimony of all of the witnesses and consideration of methods at which they arrived at the estimates, this Court finds that the fair market value of the derrick barge on October 2, 1963 was $17,500 and that the fair market value of the equipment aboard the derrick barge on October 2, 1963 was $6,000. In addition, Gulf States be allowed interest at 6% per annum on the total sum of $23,500 from the date of the loss of the barge, deducting from said sum the amount due Mobile for tow hire and attorneys'

fees as previously directed. See Carl Sawyer, Inc. v. Poor, 180 F.2d 962 (5th Cir. 1950).

■ Without contradiction, the testimony revealed that unable to replace the lost derrick barge, Gulf States was compelled to rent a makeshift barge of less value for a sum in excess of $20,000, for which sum it seeks reimbursement as consequential damages. During the trial, Gulf States acknowledged that ordinarily where there is a complete loss, the measure of damages is limited to fair market value of the property lost. However, Gulf States contends that mutuality of contract and the doctrine of implied warranty justifies the allowance of consequential damages, *ex contractu*, under the circumstances herein. While such a contention is novel and imaginative, it is without basis in law. Therefore, the Court finds that Gulf States is not entitled to any allowance for consequential damages.

Final judgment in accordance herewith is entered this date.

### FINAL DECREE

In accordance with findings of fact and conclusions of law heretofore entered this date, it is, upon consideration, hereby

DECREED:

1. That judgment be and the same is hereby entered in favor of cross-libelant, Gulf States Dredging Company, Inc., and against Mobile Towing & Wrecking Co., Inc., cross-respondent, in the amount of $23,500 plus interest at the rate of six per cent (6%) per annum from October 2, 1963, together with costs on the cross-libel to be taxed by the Clerk.

2. That judgment be and the same is hereby entered in favor of libelant, Mobile Towing & Wrecking Co., Inc., and against Gulf States Dredging Company, Inc., in the amount of $5,838.53 for tow hire on the libel plus interest at the rate of six per cent (6%) per annum from October 2, 1963, together with costs in the amount of $79.08 and reasonable attorneys' fees in the amount of $1,000.